# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re | Case No. 02-02508 |
| JORAMA DOMAGMA FEAGINS, | Chapter 7 |
| Debtor. | |
| | |
| C&W ASSET ACQUISITION, LLC, | Adv. Pro. No. 08-90057 |
| Plaintiff, | |
| vs. | |
| JORAMA DOMOGMA FEAGINS, now known as JORAMA DOMOGMA, | Re: Docket No. 2 |
| Defendant. | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The trial of this adversary proceeding was held on October 5 and 6, 2010.

Robert E. Badger and Allison M. Fujita represented plaintiff C&W Asset

Acquisition, LLC ("C&W"), and Scot Stuart Brower represented defendant

Jorama Domogma Feagins (now known as Jorama Domogma).

Based on the evidence, the court makes the following

## FINDINGS OF FACT:

1.      In 1981, Jorama Domagma, the debtor in the above-captioned bankruptcy case, married Paul Newman.  Ms. Domagma took Mr. Newman's last name.  The couple had two children.

2.      Mr. Newman was on active military duty during the marriage. Mr. Newman taught Ms. Domagma how to write checks, pay bills, and manage the family finances.  Throughout their marriage, Mr. Newman and Ms. Domogma agreed that she would have full authority and exclusive responsibility for the family's finances.

3.      Mr. Newman regularly signed general powers of attorney, prepared by the military legal offices at the bases at which he was stationed, in favor of Ms. Domagma, so that Ms. Domagma could take whatever actions the family required, particularly when Mr.  Newman was deployed or otherwise unavailable.

4.      In 1994, while Mr. Newman, Ms. Domogma, and their children were living in Hawaii, MBNA mailed an offer of a "preapproved" VISA credit card to Mr. Newman at their residence address.  Ms. Domogma filled out the application, signed it with Mr. Newman's name, and requested an additional card on the same account for herself.

5.      At the time, Mr. Domogma held a general power of attorney which

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed  10/22/10   Page 2 of 26

authorized her to accept the credit card offer on behalf of her husband. Mr. Newman also implicitly authorized her to do so by entrusting her with responsibility for the family finances.

6.      Pursuant to the application, MBNA opened a VISA account (the "Account") and issued cards to Ms. Domogma and Mr. Newman. When the cards arrived in the mail, Ms. Domogma gave Mr. Newman the card with his name on it and kept the additional card with her name on it. Mr. Newman accepted the card without making any complaint or asking any questions.

7.      Initially, MBNA sent the statements for the Account to the street address at which Ms. Domogma and Mr. Newman lived when they first moved to Hawaii. Ms. Domogma changed the mailing address to a post office box in her name and to which she had sole access. She did this for convenience, because most of the family bills came to the post office box and because the initial address had been only temporary.

8.      Between May 1996 and April 1997, Ms. Domogma used the Account to obtain three cash advances totaling $10,951.36. Throughout this period, Ms. Domogma made monthly payments on the Account in amounts at least equal to the required minimum payment.

9.      When she accepted the credit card offer on behalf of Mr. Newman

3

and when she took the cash advances, she intended to repay the amounts she borrowed on the Account.

10.     Mr. Newman and Mr. Domogma had marital problems beginning sometime in the 1980's. The marriage finally collapsed in 1997. On November 14, 1997, Ms. Domogma commenced a divorce proceeding against Mr. Newman in the Family Court of the First Circuit, State of Hawaii.

11.     Although the papers filed in the Family Court state that both Mr. Newman and Ms. Domogma appeared pro se, in reality an attorney named Barbara Melvin counseled both of them and prepared legal papers for them.[1]

12.     In February 1998, Mr. Newman completed (in his own handwriting), signed, and filed in the Family Court an asset and debt statement. He listed a debt to MBNA, incurred in January 1996, with a total balance owed of $10,313.40 and a minimum monthly payment of $215.00. This listing referred to the Account.

13.     Also in February 1998, Ms. Domogma completed, signed, and filed in the Family Court an asset and debt statement. She listed a joint debt to "MBNA Mastercard" in the amount of $11,000 with an unknown minimum payment. This listing also referred to the Account.   The reference to a Mastercard was an error;

---

[1]On December 1, 2009, Ms. Melvin resigned from the bar in lieu of discipline pursuant to rule 2.14(a) of the Rules of the Hawaii Supreme Court. Such a resignation is the same as disbarment. Id. rule 2.14(d).

4

the couple had no joint MBNA Mastercard, only an MBNA VISA account (the Account) for which both spouses held cards.

14.　　At about the same time, Mr. Newman and Ms. Domogma agreed to the terms of a divorce decree.  The Family Court entered the decree on May 1, 1998.  Among other things, the decree provided that Mr. Newman "shall be solely responsible for the joint debts of the parties to MBNA Mastercard, in the amount of $11,000.00 . . . ."  This provision referred to the Account.  The reference to a Mastercard was an error; as noted above, the couple had no joint MBNA Mastercard, only an MBNA VISA card for which both spouses held cards.

15.　　Mr. Newman never disputed his liability for the Account until well after the entry of the divorce decree.

16.　　In February 1998, Ms. Domogma joined the United States Army.  She is still on active duty with the Army.

17.　　In July 1998, Ms. Domogma married Roosevelt Feagins and took his last name.

18.　　In mid-1999, Mr. Newman responded to MBNA's attempts to collect the Account from him by contending that he was not liable because Ms. Domogma had forged his signature on the application.  He filed a report with the Honolulu Police Department containing the same accusations.

5

19.     C&W bought the Account from MBNA, effective as of May 1, 2000, and began its own efforts to collect the Account from Mr. Newman.  He continued to maintain that he was not liable because his ex-wife, Ms. Domogma, had forged his signature on the application.

20.     On August 14, 2001, Mr. Newman commenced an action (the "Federal Action") against C&W and one of its employees in the United States District Court for the District of Hawaii.  He alleged that he was not responsible for the Account because Ms. Domogma had forged his signature on the application, and that the defendants had violated the Fair Debt Collection Practices Act and other statutes.

21.     On November 6, 2001, C&W and its employee filed a third party complaint in the Federal Action against MBNA and Ms. Domogma, seeking indemnity against Mr. Newman's claims.

22.     On November 8, 2001, C&W's counsel mailed a letter to Ms. Domogma, asking her to waive service of the third party complaint.  The letter incorrectly refers to "The Cadle Company" rather than C&W as the third-party plaintiff.  The letter was addressed to Ms. Domogma at an APO address. Ms. Domogma denies that she received this letter, and there is no evidence that she actually received it.

6

23.     On May 9, 2002, a deputy sheriff served C&W's third party complaint in the Federal Action on Ms. Domogma by leaving a copy at her residence with one of her children, who was then about twenty years old. Ms. Domogma testified that she never actually received the complaint. She also testified that her child told her that the child had not received the complaint either, but this testimony is hearsay. The third party complaint was properly served and Ms. Domogma had notice of it, but she did not have actual knowledge of it. Her denial of receipt was emphatic and credible. One of two things occurred; either her child concealed the document from her, in a misguided attempt to spare her mother some pain; or Ms. Domogma took the "head in the sand" attitude that is common among those in desperate financial straights and never looked at the document.

24.     On May 31, 2002, C&W took Mr. Newman's deposition in the Federal Action. There is no evidence that C&W served notice of the deposition on Ms. Domogma. Ms. Domogma did not appear at the deposition.

25.     The record does not show how the Federal Action was terminated.

26.     On June 27, 2002, C&W's counsel sent a letter to Ms. Domogma at her then address stating (incorrectly) that The Cadle Company owned the Account and demanding payment. Although Ms. Domogma denied receiving the letter, I

7

find that it was properly delivered to her home, although she may not have read it for the reasons stated above.

27.     On July 12, 2002, Ms. Domogma filed a petition in this court for relief under chapter 7 of the Bankruptcy Code.  Barbara Melvin acted as Ms. Domogma's attorney.  Ms. Domogma listed MBNA as a creditor and the Account as one of her debts.  She did not list C&W or Cadle as creditors.  Neither C&W nor Cadle received notice or had knowledge of the bankruptcy filing until much later.

28.     Mr. Feagins, who was then Ms. Domogma's husband, signed the petition and schedules with Ms. Domogma's name.  Ms. Domogma authorized Mr. Feagins to do so and intended to be bound by the documents which he signed for her.  (Later in 2002, Ms. Domogma divorced Mr. Feagins and resumed her maiden name.)

29.     Ms. Domogma's failure to list C&W was an oversight by her and her attorney, Ms. Melvin.  Ms. Domogma did not intentionally omit C&W as a creditor.

30.     No creditor filed a timely objection to Ms. Domogma's discharge or a timely complaint to determine the dischargeability of any particular debt.  This court issued a discharge to Ms. Domogma and closed her case on October 18,

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed  10/22/10   Page 8 of 26

2002.  On that date, C&W had neither notice nor knowledge of the bankruptcy case.

31.     On September 23, 2002, after Ms. Domogma filed her bankruptcy petition and before she received her discharge, C&W sued Ms. Domogma on the Account in the District Court of the First Circuit, State of Hawaii.  C&W served the complaint on Ms. Domogma by delivering it to her adult child at her residence. C&W obtained a default judgment against Ms. Domogma on November 8, 2002.

32.     C&W learned about Ms. Domogma's bankruptcy and discharge in January 2003.  C&W obtained copies of her bankruptcy petition and schedules and learned that Ms. Domogma had listed MBNA, but not C&W, as a creditor.

33.     C&W attempted to enforce the default judgment by obtaining withholding from her military pay.  The military refused, however, because C&W had not complied with the Servicemembers' Civil Relief Act.  C&W then moved the state court to vacate the default judgment.  In order to comply with the Act, C&W's employee, Mr. Benetis, persuaded Ms. Domogma in 2005 to sign a document entering her appearance in the state court case.

34.     C&W then moved the state court for summary judgment.  On March 7, 2006, the state court entered judgment on the Account in favor of C&W and against Ms. Domogma in the amount of $27,643.65.  Subsequently, C&W

9

collected a portion of the judgment by withholdings from Ms. Domogma's military pay. (The record does not reveal the exact amount collected.)

35. In 2007, Mr. Domogma retained counsel to help her deal with C&W's collection efforts. Her counsel demanded that C&W cease collection actions based on the discharge. C&W denied that the debt was discharged.

36. On July 2, 2008, Ms. Domogma filed a motion in her bankruptcy case for an order holding C&W in contempt of the automatic stay and the discharge injunction and assessing damages against C&W. After briefing and a hearing, I denied the motion without prejudice and permitted C&W to file a complaint for a determination of the dischargeability of the Account not later than October 20, 2008.

37. On October 1, 2008, C&W filed the complaint that initiated this adversary proceeding. C&W alleged that Ms. Domogma had forged Mr. Newman's signature on the application for the Account and that therefore the Account is a nondischargeable debt.

38. Ms. Domogma filed an answer, in which she denied the material allegations of the complaint, and a counterclaim, in which she alleged that C&W violated the automatic stay and the discharge injunction.

Based on the foregoing findings of fact, the court makes the following

10

**CONCLUSIONS OF LAW**:

1.     The court has jurisdiction over this adversary proceeding, which is a core proceeding in bankruptcy.  28 U.S.C. § 157(b)(2)(I) (2006).  Venue is proper.

**A.     Admissibility of Deposition Transcripts**

2.     C&W offers portions of three deposition transcripts in evidence. Ms. Domogma claims that the depositions are not admissible.

3.     Norman Lau is the attorney who represented Mr. Newman in the Federal Action.  Mr. Lau was unavailable to testify at trial due to a recent surgery.

4.     Ms. Domogma argues that Mr. Lau's deposition testimony is hearsay to the extent that he testified about things that Mr. Newman said.  Ms. Domogma is correct, and Mr. Lau's testimony is inadmissible to prove the truth of Mr. Newman's statements.  Mr. Lau's deposition testimony is admissible for other purposes, however, such as to establish that Mr. Newman made certain allegations of forgery (but not to prove that those allegations were true) and was willing to pursue those allegations in litigation, and to establish the circumstances in which Mr. Newman's deposition was taken in the Federal Action.

5.     Vatchari Reyes is a police officer who prepared the report based on Mr. Newman's forgery complaint to the police.  Officer Reyes' testimony about what Mr. Newman said is hearsay and is inadmissible to prove the truth of

Mr. Newman's statements. Officer Reyes' testimony is admissible, however, for other purposes, such as to establish that Mr. Newman made a police report.

6.      Paul Newman resides in Okinawa, Japan, and therefore was unavailable to testify at trial. He declined to provide deposition testimony in this adversary proceeding and Japanese law does not permit nonconsensual depositions. C&W offers Mr. Newman's deposition taken in the Federal Action and argues that it is admissible under Fed. R. Evid. 804(b)(1) or Fed. R. Civ. P. 32(a)(8).

7.      C&W has not shown that Mr. Newman's deposition is admissible under rule 32(a)(8). Under that rule, only a "lawfully taken" deposition is admissible in a subsequent action between the same parties or their representatives or successors. There is no evidence that Ms. Domogma was given notice of the deposition as rule 30(b)(1) requires.

8.      Similarly, Mr. Newman's deposition is not admissible under rule 804(b)(1). Because there is no evidence that Ms. Domogma was given the requisite notice of the deposition, C&W has not shown that the deposition was "taken in compliance with law" and that Ms. Domogma had an "opportunity" to cross examine.

9.      C&W argues that it was motivated to establish that Mr. Newman was

12

lying about the forgery, but this is insufficient. Under rule 804(b)(1), either "the party against whom the testimony is now offered or, in a civil action or proceeding, a <u>predecessor in interest</u>" must have had a chance to examine the deponent. C&W is not Ms. Domogma's predecessor in interest.

10. In the unusual circumstances of this case, however, I will receive in evidence the designated portions of Mr. Newman's deposition under Fed. R. Evid. 807.

**B.** **Dischargeability of Debt Under Section 523(a)(2)**

11. C&W contends that the Account is not dischargeable under section 523(a)(2) of the Bankruptcy Code because of Ms. Domogma's alleged forgery.

12. Exceptions to discharge are construed strictly against the creditor and liberally in favor of the debtor. <u>Snoke v. Riso</u> (<u>In re Riso</u>), 978 F.2d 1151, 1154 (9th Cir. 1992); <u>see</u> <u>also</u> <u>National Union Fire Insurance Co. of Pittsburgh v. Bonnanzio</u> (<u>In re Bonnanzio</u>), 91 F.3d 296, 300 (2d Cir. 1996); <u>Meyer v. Rigdon</u>, 36 F.3d 1375, 1385 (7th Cir. 1994).

13. The plaintiff seeking to establish an exception to the discharge bears the burden of proof. Fed. R. Bankr. P. 4005; <u>see</u> <u>also</u> <u>In re Niles</u>, 106 F.3d 1456, 1464-65 (9th Cir. 1997). The plaintiff must meet this burden by a preponderance

13

of the evidence.   Grogan v. Garner, 498 U.S. 279, 286 (1991); Turtle Rock

Meadows Homeowners Ass'n v. Slyman (In re Slyman), 234 F.3d 1081, 1085 (9th

Cir. 2000).

      14.    Section 523(a)(2)(A) of the Bankruptcy Code  provides:

> A discharge under . . . this title does not discharge an individual
> debtor from any debt -
>
>                     \* \* \*
>
> (2)    for money, property, services, or an extension,
> renewal or refinancing of credit, to the extent
> obtained by -
>
>     (A)    false pretenses, a false representation, or
> actual fraud, other than a statement
> respecting the debtor's or an insider's
> financial condition . . .

11 U.S.C. § 523(a) (2009); see also Cohen v. de la Cruz, 523 U.S. 213, 218-22

(1998).

      15.    To prevail on a claim under § 523(a)(2)(A), a creditor must

demonstrate five elements:

> (1)    misrepresentation, fraudulent omission or deceptive conduct by
> the debtor;
>
> (2)    knowledge of the falsity or deceptiveness of his statement or
> conduct;
>
> (3)    an intent to deceive;

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed  10/22/10   Page 14 of 26

(4)    justifiable reliance by the creditor on the debtor's statement or
conduct; and

(5)    damage to the creditor proximately caused by its reliance on
the debtor's statement or conduct.

In re Weinberg, 410 B.R. 19, 35 (B.A.P. 9th Cir. 2009); In re Slyman, 234 F.3d at

1085; Am. Express Travel Related Servs. Co. v. Hashemi (In re Hashemi), 104

F.3d 1122, 1125 (9th Cir. 1996).

16.    Forgery is "[t]he act of fraudulently making a false document or

altering a real one to be used as if genuine."  Black's Law Dictionary 722 (9th ed.

2009); see also Maui Finance Co. v. Han, 34 Haw. 226, 1937 WL 4450 (Haw.

Terr. 1937).   Forging the signature of another can satisfy the first element of

section 523(a)(2)(A).  See, e.g., In re Schenck, 2010 WL 1257744 (Bankr. E.D.

La. Mar. 26, 2010); In re Larose, 2008 WL 5636385 (Bankr. M.D. Fla. Oct. 14,

2008); In re O'Brien, 247 B.R. 583 (Bankr. D. R.I. 2000); In re Rudicil, 123 B.R.

778 (Bankr. N.D. Ohio 1991), aff'd, 983 F.2d 1065 (2d Cir. 1992).

17.    C&W has not carried its burden of proving that Ms. Domogma forged

her husband's signature on the Account application.  She had the authority to sign

his name, by virtue of the written power of attorney which he gave her and his

delegation to her of complete authority over the family's finances.

18.    Even if Ms. Domogma initially lacked authority to sign the Account

15

application for Mr. Newman, he later ratified her conduct. Ratification is "the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him." Maui Fin. Co. v. Han, 34 Haw. at 230; see also Clews v. Jamieson, 182 U.S. 461, 483 (1901) ("A principal can adopt and ratify an unauthorized act of his agent who in fact is assuming to act in his behalf, although not disclosing his agency to others, and when it is so ratified it is as if the principal has given an original authority to that effect and the ratification relates back to the time of the act which is ratified."). Any conduct manifesting an intent to treat an unauthorized act as authorized, including the failure to repudiate the unauthorized act, supports a finding of ratification. Rayonier, Inc. v. Polson, 400 F.2d 909, 915 (9th Cir. 1968). A principal may ratify the forgery of his signature by an agent. See, e.g., In re W.R. Grace & Co., 366 B.R. 302, 305 (Bankr. D. Del. 2007); Common Wealth Ins. Systems, Inc v. Kersten, 40 Cal. App.3d 1014, 1024, 115 Cal. Rptr. 653, 660 (Cal. App. 1974).

19.     Mr. Newman ratified Ms. Domogma's signature on the Account application when he agreed, in the divorce decree, to pay the Account. Mr. Newman was the principal under the express grant of authority contained in the power of attorney and the implicit grant of authority which he gave Ms. Domogma

16

over the family's finances.  She signed the Account application on his behalf, i.e., as his agent.  When he signed the divorce decree, he knew about the Account.  He knew someone had applied for it; because he did not fill out the application, he must have known that his wife did so.  By agreeing to pay the Account, he manifested an intent to ratify the signature on the Account application.

20.     Ms. Domogma's debt to C&W is dischargeable and was discharged.

## C.     Denial or Revocation of Discharge Under Section 727

21.     C&W's complaint and trial brief cite sections 727(a)(4)(A) and 727(d).  Although C&W has not analyzed or argued the applicability of either section, I will address them.

22.     Section 727(a)(4) requires the court to deny the debtor's discharge if "the debtor knowingly and fraudulently, in or in connection with the case" made a false oath or account.  This section does not apply for two reasons.

a.     The time to assert an objection under section 727 expired long before C&W filed its complaint.

b.     C&W identifies no fraudulent conduct done "in or in connection with the [bankruptcy] case."  Even if Mr. Domogma had forged the Account application (and she did not), she did so long before she filed her bankruptcy case.

17

23.     Section 727(d) permits the court to revoke a discharge that was obtained through fraud.  This section is also inapplicable.

a.     The time to assert a claim under section 727(d) has run, see section 727(e).

b.     The alleged fraud of which C&W complains had nothing to do with the issuance of the discharge.

## D.     Violation of Discharge Injunction

24.     A discharge "operates as an injunction against the commencement or continuation of an action . . . to collect, recover or offset any [discharged] debt as a personal liability of the debtor."  11 U.S.C. § 524(a)(2) (2006).  A party who knowingly violates the discharge injunction can be held in contempt under section 105(a) of the Bankruptcy Code.  See In re Zilog, 450 F.3d 996, 1007 (9th Cir. 2006); Walls v. Wells Fargo Bank, N.A. (In re Walls), 276 F.3d 502, 507 (9th Cir. 2002).  Section 105(a) permits the bankruptcy court to "issue any order . . . that is necessary or appropriate to carry out the provisions of this title."  An award of damages under section 105(a) is discretionary.  United States v. Arkison (In re Cascade Roads, Inc.), 34 F.3d 756, 767 (9th Cir. 1994); In re Pace, 67 F.3d 187, 193 (9th Cir. 1995).  The party seeking contempt sanctions has the burden of proving, by clear and convincing evidence, that the sanctions are justified.  In re

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed  10/22/10   Page 18 of 26

Bennett, 298 F.3d 1059, 1069 (9th Cir. 2002). "[T]he movant must prove that the creditor (1) knew the discharge injunction was applicable and (2) intended the actions which violated the injunction." Id. (citing Hardy v. United States (In re Hardy), 97 F.3d 1384, 1390 (11th Cir. 1996)).

25.    C&W has admitted that it found out about Ms. Domogma's bankruptcy proceeding and discharge in January 2003. Its subsequent actions to collect the Account were intentional.

26.    C&W contends its actions were not a willful violation because it believed that the Account was not discharged pursuant to section 523(a)(3)(B), which provides that the bankruptcy discharge

does not discharge an individual debtor from any debt –

* * *

(3)    neither listed nor scheduled under section 521(1) of this title, with the name, if known to the debtor, of the creditor to whom such debt is owed, in time to permit--

* * *

(B)    if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt under one of such paragraphs, unless such creditor had notice or actual knowledge of the case in time for such timely filing and request . . . .

19

27.     C&W takes the position that it was entitled to collect the Account from Ms. Domogma despite the discharge because C&W believed that the Account was covered by section 523(a)(2), and that it could do so even though no court had decided that the Account was in fact covered by section 523(a)(2). There is no support for C&W's position.

28.     An unbroken line of authority holds that section 523(a)(3)(B) does not, in itself, make a debt nondischargeable. Rather,

> *The purpose of § 523(a)(3)(B) is to allow a creditor to file a nondischargeability complaint when it would otherwise be barred by the time limitations of § 523(c) and Bankruptcy Rule 4007(c).* Section 523(c) requires a complaint to determine dischargeability under § 523(a)(2), (4), or (6), to be filed, and Rule 4007(c) requires the complaint to be filed within sixty days of the first meeting of creditors.
>
> Section 523(a)(3)(B) does not create a separate exception from discharge merely for the debtor's failure to schedule a creditor. Instead, the creditor must also have a cause of action under § 523(a)(2), (4), or (6). *Mere allegations of a cause of action are not sufficient.* "It remains necessary for the creditor to prove its case under either code § 523(a)(2), (4), or (6) because 11 U.S.C. § 523(a)(3)(B) only applies if such a case can be established." 1 Norton Bankruptcy Law and Practice, § 27:67 (1981).

In re Lochrie, 78 B.R. 257, 259 (B.A.P. 9th Cir. 1987) (emphasis added). The creditor must still establish that its claims are nondischargeable under section 523(a)(2), (4), or (6). Id.; see also In re Waugh, 172 B.R. 31, 34 (Bankr. E.D.

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed 10/22/10   Page 20 of 26

Ark. 1994) ("section 523(a)(3)(B) works to preserve the right to litigate the dischargeability of a debt when the creditor did not receive notice, but, at the same time, precludes that creditor from receiving a "windfall" of nondischargeability due to a clerical error"), rev'd on other grounds, 198 B.R. 545 (E.D. Ark. 1995), aff'd, 95 F.3d 706 (8th Cir. 1996); In re Thompson, 152 B.R. 24, 27 (Bankr. E.D. N.Y. 1993) ("If the creditor does not file a complaint, or if upon consideration of such complaint, the debt is determined to be dischargeable, the debt is then discharged"); In re Zablocki, 36 B.R. 779, 782 (Bankr. D. Conn. 1984) ("[T]o establish the § 523(a)(3)(B) exception, a creditor must show that he actually had grounds under § 523(a)(2), (4), or (6) and that the debtor's failure to schedule him deprived him of the opportunity to assert these grounds at the proper time"); In re Ratliff, 27 B.R. 465, 467 (Bankr. D. Va. 1983) (holding that valid causes of action arising under § 523(a)(2), (4), or (6) are protected by the savings provisions of § 523(a)(3)(B) and 523(c) even when a creditor would be time barred from filing a complaint under § 523(a)(2), (4), or (6)).

29.    All of these cases were decided well before C&W decided to pursue collection actions against Ms. Domogma in 2003.

30.    C&W evidently did some legal research.  Throughout its dealings with Ms. Domogma, C&W had both in-house counsel and outside counsel.  When

21

Ms. Domogma's counsel told C&W that it was violating the discharge injunction, C&W's employee, Mr. Benetis, responded with a citation to In re Beezley, 994 F.2d 1433 (9th Cir. 1993) (per curiam). The Beezley decision, however, actually undercuts C&W's case. Beezley construed section 523(b)(2)(A) and held that, in a no-asset chapter 7 case where no bar date for filing claims is established, even claims that the debtor fails to list in the schedules are discharged. The Beezley court did not have to address section 523(b)(2)(B), but the concurring opinion expressly stated that the creditor cannot escape the need to prove nondischargeability merely because the debtor failed to list the debt owed to the creditor, and that "whether Beezley's debt to [the creditor] is in fact nondischargeable remains to be adjudicated." Id. at 1441 (O'Scannlain, J., concurring). (The Ninth Circuit later adopted the reasoning of the Beezley concurrence in its entirety. See In re Neilsen, 383 F.3d 922, 923 (9th Cir. 2004)).

31. C&W also cites In re Beaty, 306 F.3d 914 (9th Cir. 2002), as support for its proposition that the Account was not discharged pursuant to section 523(a)(3)(B). See Pl.'s Trial Br. 14. Beaty holds only that the doctrine of laches applies to actions under section 523(a)(3)(B). The majority and concurring opinions make it clear that Beaty did not change the uniform rule that section 523(a)(3)(B) indefinitely extends the time to file a complaint under sections

22

523(a)(2), (4), or (6), but does not relieve the creditor of the obligation to prove that its claim is in fact of the kind specified in those sections.

32. The conclusion is inescapable that C&W's violation of the discharge injunction was willful. C&W knew about section 523(b)(2)(B) and knew that courts had interpreted it. Even the case it mentioned in its correspondence with Ms. Domogma's counsel demonstrates that C&W's position was untenable. C&W's decision to proceed nonetheless was willful.

33. C&W also violated the automatic stay of section 362 by filing its complaint in state court and prosecuting its third party complaint in the Federal Action against Ms. Domogma. This violation was not willful, however, because C&W had neither notice nor knowledge of the bankruptcy case until after the discharge was entered and the automatic stay terminated.

**E.** **Remedies for Discharge Violation.**

34. Ms. Domogma seeks damages for emotional distress, punitive damages, and attorneys' fees and costs as a result of C&W's willful violation of the discharge injunction. "Compensatory civil contempt allows an aggrieved debtor to obtain compensatory damages, attorneys fees, and the offending creditor's compliance with the discharge injunction." In re Walls, 276 F.3d at 507.

35. Not every willful violation of the discharge injunction merits

23

compensation for emotional distress or punitive damages. For violations of the automatic stay, a claim for emotional distress damages is only appropriate if the individual: (1) suffers significant harm; (2) clearly establishes the significant harm; and (3) demonstrates a causal connection between the harm and violation of the stay. Dawson v. Washington Mutual Bank, F.A., 390 F.3d 1139, 1149 (9th Cir. 2010). This standard protects against frivolous claims with only fleeting or trivial anxiety insufficient to warrant compensatory damages. Id.; see also In re Grand, 2009 WL 790205 (Bankr. D. Haw. 2009); In re Skeen, 248 B.R. 312, 319 (Bankr. E.D. Tenn. 2000); Crispell v. Landmark Bank, 73 B.R. 375, 380 (Bankr. E.D. Mo. 1987). Although Dawson considered the remedy for violations of the automatic stay under section 362(k)(1), the same reasoning applies to willful violations of the discharge injunction.

36. A debtor can establish the requisite harm in several ways: corroborating medical evidence; testimony by non-experts of physical manifestations of mental distress; and, in some cases, the distress may be readily apparent, such as in egregious conduct. Dawson, 390 F.3d at 1149-50.

37. C&W's violations of the discharge occurred at a terrible time in Ms. Domogma's life. During much of the relevant period, the Army deployed Ms. Domogma in the Iraq war. She was coping with the stress of living and

24

working in a war zone. Because of her duties and her remote location,

Ms. Domogma was not able to respond effectively to C&W's demands, which must

have made her feel helpless.

38.     I am unable to conclude, however, that the distress which C&W

inflicted on Ms. Domogma rises to the high level required by Dawson. There is no

evidence that Ms. Domogma's distress caused any physical manifestations or

prevented her from doing her job and going about her life. Therefore, an award for

damages as a result of emotional distress is not appropriate.

39.     The bankruptcy court lacks the power to award punitive damages

(with the possible exception of "'relatively mild' non-compensatory fines") under

section 105(a) for a violation of the discharge. In re Dryer, 322 F.3d 1178, 1192-

93 (9th Cir. 2003). Even if I had the power, I am not convinced that C&W's

conduct was sufficiently egregious to justify a noncompensatory award.

40.     Attorneys' fees and costs are an appropriate remedy for contempt

under section 105(a). In re Walls, 276 F.3d at 507.[2] An award of reasonable

attorneys' fees and costs incurred as a result of C&W's violation of the discharge

_____

[2]The Ninth Circuit has limited the amount of attorneys' fees and costs that a court can
awarded for an automatic stay violation under section 362(k)(1). Sternberg v. Johnston, 595 F.3d
937, 945-48 (9th Cir. 2010). The court expressly said, however, that it was not considering the
civil contempt authority of the court and that its opinion should not be construed to limit the
availability of contempt sanctions, including attorneys' fees, under such authority. Id. at 946 n.3.

25

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed  10/22/10   Page 25 of 26

injunction, including the fees incurred in this adversary proceeding, is an appropriate remedy.

41.     Section 523(d) also authorizes an award of attorney's fees and costs:

> If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court *shall* grant judgment in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding if the court finds that the position of the creditor was not substantially justified, except that the court shall not award such costs and fees if special circumstances would make the award unjust.

11 U.S.C. § 523(d) (emphasis added).  The Account was a consumer debt.  C&W's position was not substantially justified.  No special circumstances are present.  The award of attorneys' fees and costs is thus mandatory under section 523(d).

42.     In addition, C&W must restore to Ms. Domogma any amounts that it collected from her on the Account, including any withheld wages, plus appropriate prejudgment interest.  If the parties are unable to agree on the amount of the collections, either party may file a motion for a court determination.

After the amount of the collections is determined, counsel for Ms. Domogma shall submit a separate and final judgment in favor of the defendant.  Costs and attorneys' fees shall be taxed as provided in the local rules.



*/s/ Robert J. Faris*
**United States Bankruptcy Judge**
Dated: **10/22/2010**

26

U.S. Bankruptcy Court - Hawaii   #08-90057   Dkt # 90   Filed  10/22/10   Page 26 of 26